# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:21-cr-736 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| DAMIEN STAFFORD, et al., | ) | |
| | ) | |
| DEFENDANT. | ) | |

Now before the Court is the motion of defendant Damien Stafford ("Stafford") to suppress all evidence derived from the search of his residence ("White Pond") obtained through the execution of a search warrant on September 23, 2021. (Doc. No. 190 (Motion).) Plaintiff United States of America (the "government") opposes the motion. (Doc. No. 206 (Response).)

In a telephonic conference on October 25, 2022, the Court, without objection from either party, found a hearing on Stafford's motion was unnecessary because the motion presents strictly legal arguments that must be resolved by an examination of the four corners of the affidavit supporting the search warrant. (Minute Order, 10/25/2022.) *United States v. Goodwin*, 552 F. App'x 541, 548 (6th Cir. 2014) ("An evidentiary hearing is required only when the defendant has set forth contested issues of fact that bear upon the legality of the search." (quotation marks and citation omitted)); *see United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021) (probable cause is determined upon an examination of the "four corners" of the supporting affidavit. (citation omitted)).

For the reasons that follow, the motion to suppress is DENIED.

I. **BACKGROUND**

The search in question was executed pursuant to a warrant issued by a magistrate judge of the United States District Court for the Northern District of Ohio (Doc. No. 185-1 (Search Warrant).) The search warrant, in turn, was supported by an affidavit sworn by Special Agent Christopher Fassler of the Federal Bureau of Investigation ("SA Fassler"). (Doc. No. 209-1 (Affidavit).) SA Fassler, a law enforcement officer with eleven years of service, averred that over the course of his career he has received specialized training and has gained experience in narcotics investigations. (*Id.* ¶ 2.)

Most of the forty-five-page affidavit detailed a multi-year investigation into a suspected drug trafficking organization ("DTO") operated by Stafford (the "Stafford DTO") in the greater-Akron, Ohio, area. (*Id.* ¶¶ 4(1), 8.) The affidavit outlined and described the various investigatory techniques employed by law enforcement—such as court-interception of cellular phones, GPS tracking devices, surveillance, interviews, controlled buys, and social media searches—before seeking the warrant at issue herein. (*Id.* ¶ 6.)

The application for a search warrant and affidavit sought permission to search Stafford's residence (White Pond). (Doc. No. 209-1 ¶ 4(2).) It also requested the seizure of drug-trafficking-related items, including books, records, receipts, notes, ledgers, and other papers related to the sale or distribution or controlled substances, any illegal narcotics, U.S. currency in excess of $2,000, packaging materials, scales, drug paraphernalia, ATM receipts, personal papers, firearms, and cell

phones (and their contents including contacts, call history, text messages, emails, voicemails, pictures, videos, and applications and their contents). (*Id.*, Attach. B, at 47–48.[1])

As justification for the search of White Pond and seizure of drug trafficking-related items, the affidavit provided that Stafford is a suspected drug dealer with a criminal history of drug dealing. (*Id.* ¶ 9.) SA Fassler's affidavit further averred that "[b]ased on investigation, I believe WHITE POND is STAFFORD'S primary local residence, also used by STAFFORD to store and distribute drugs and weapon(s), and to maintain the proceeds from the sale of drugs." (*Id.* ¶ 4(2).) As further support, SA Fassler's affidavit recounted intercepted telephone conversations between Stafford and associates, during which they seemed to discuss buying and/or selling narcotics. (*E.g.*, *id*. ¶¶ 56, 58.) The affidavit also described how Stafford and members of the Stafford DTO were frequently present and/or made stops at White Pond during the course of and in relation to drug transactions, including during two controlled purchases of drugs from Stafford at White Pond (*id.* ¶¶ 15–17) and after members of the Stafford DTO returned from South Carolina where they likely retrieved an unknown amount of drugs to distribute in the Akron area (*id.* ¶ 113).

The search warrant was signed on September 23, 2021, and executed the same day. At White Pond, officers found and collected various items, including (1) a Glock model 27 .40 caliber semiautomatic pistol; (2) a .40 magazine with eight bullets; (3) approximately 3,139.5 grams of marijuana; (4) an iPhone; (5) $10,390 in cash; (6) 2011 Dodge Durango title; (7) a money counter; and (8) miscellaneous drug utilities, including drug scale, plastic bags with possible drug residue. (Doc. No. 190, at 2; Doc. No 206, at 2.)

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic docketing system.

On October 14, 2021, a grand jury returned an indictment charging Stafford and two-codefendants with conspiracy to possess with intent to distribute fentanyl. (Doc. No. 13.) The indictment also charged Stafford with intent to distribute a controlled substance, namely fentanyl. (*Id.*) On February 2, 2022, the grand jury returned a superseding indictment, charging Stafford and 12 co-defendants with conspiracy to possess with intent to distribute methamphetamine, fentanyl, valeryl fentanyl, and cocaine. (Doc. No. 34.) The superseding indictment also charged Stafford with, among other offenses, being a felon in possession of a firearm and ammunition. (*Id.*) Stafford was arraigned on the superseding indictment March 8, 2022, pled not guilty, and ordered detained pending trial. (Minute Order, 03/08/2022.) A jury trial is currently set to begin on January 9, 2023, on a one-week standby basis. (Doc. No. 160 (Ends of Justice Order).)

## II. LAW AND DISCUSSION

The Fourth Amendment mandates that there must be probable cause for any search and seizure. U.S. Const. Amend. IV. "Probable cause has been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Padro*, 52 F.3d 120, 122–23 (6th Cir. 1995) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (internal quotation marks and citation omitted). "Probable cause is based on the totality of the circumstances; it is a 'practical, non-technical conception that deals with the factual and practical considerations of everyday life.'" *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006) (quoting *Frazier*, 423 F.3d at 531).

"With great deference toward the issuing judge's determination, federal courts examine the affidavit's four corners to determine whether, under the totality of the circumstances, the low bar of probable cause has been overcome." *Moore*, 999 F.3d at 996 (citation omitted); *see Whiteley v. Warden*, 401 U.S. 560, 565 n.8, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971); *Aguilar v. Texas*, 378 U.S. 108, 109 n.1, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), *abrogated on other grounds by Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). The affidavit is "judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

Even if probable cause is lacking to support the issuance of a search warrant, a search may still be upheld under the good faith exception articulated in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). Under this exception, the exclusionary rule will not apply to bar the admission of evidence seized in violation of the Fourth Amendment where the officers had a "good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996) (quoting *Leon*, 468 U.S. at 905). The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances . . . may be considered." *Leon*, 468 U.S. at 922–23 n.23.

The good-faith defense will not apply, however, where: (1) the supporting affidavit contains information the affiant knew or should have known is false; (2) the issuing magistrate lacked neutrality and detachment; (3) the affidavit is devoid of information that would support a probable cause determination making any belief that probable cause exists completely

5

unreasonable; or (4) the warrant is facially deficient. *Leon*, 468 U.S. at 923; *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003) (citations omitted).

### A. Nexus Between Drug Trafficking and White Pond

Stafford now seeks to suppress all evidence found in the search of White Pond. He argues that the warrant affidavit failed to set forth probable cause to search White Pond. In particular, he posits that the affidavit relies on the fact that he is a suspected drug dealer without providing any reason to believe evidence of drug dealing would be found at White Pond. (Doc. No. 190, at 2–4.)

"To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place[,]'" as opposed to some other place. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc); *see United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016). "There must, in other words, be a *nexus* between the place to be searched and the evidence sought." *Brown*, 828 F.3d at 381 (quotation marks and citation omitted, emphasis in original). The nexus requirement does not dictate that officers have unassailable, direct knowledge that evidence of illegal activity will be found in the location to be searched. Rather, as is the case with all probable cause inquires, officers need only present the issuing judge with sufficient evidence to allow for a "practical, common-sense" conclusion that "there is a fair probability that contraband or evidence of a crime will be found [at the place or thing to be searched]." *United States Washington*, 380 F.3d 236, 240 (6th Cir. 2004) (quoting *Carpenter*, 360 F.3d at 594).

Courts within the Sixth and other circuits have struggled with the issue of whether probable cause exists to search a suspected drug dealer's residence merely because the drug dealer resides there. The Sixth Circuit recently explored the source of this confusion in an opinion in *United States v. Reed*, 993 F.3d 441 (6th Cir. 2021). The court in *Reed* explained that the recurring debate

6

over the sufficiency of the evidence needed to search a drug dealer's home is fueled by two competing Fourth Amendment principles. *Id*. at 444. The first principle provides that "probable cause to arrest a suspect does not necessarily establish probable cause to search the suspect's home." *Id*. at 447 (citing *United States v. Baker*, 976 F.3d 636, 645–46 (6th Cir. 2020)). "Rather, the arrest and search inquires ask different questions: whether there is a fair probability that a person has committed a crime versus whether there is a fair probability that the person's home will contain evidence of one." *Id*.

The second principle, the court in *Reed* explained, is that "the probable-cause test allows officers to make common-sense conclusions about where people hide things." *Id*. at 444. "So many courts have acknowledged as a common-sense matter that a suspect's home often will be a likely place that the suspect has kept evidence of a crime." *Id.* at 447 (citing *United States v. Williams*, 554 F.3d 683, 688 (6th Cir. 2008) (collecting cases)). "All things being equal [therefore], 'it is reasonable . . . to assume that a person keeps his possessions where he resides." *Id*. (citation omitted).

The tension between these two principles has "pulled courts in both directions when they have tried to answer this nexus question. The result? Courts have drawn fine lines between cases with 'little to distinguish' those that find probable cause from those that do not." *Id*. (quoting *United States v. Sacova*, 761 F.2d 292, 298 (6th Cir. 1985)). For example, the Sixth Circuit has rejected the proposition that the defendant's "status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home." *Brown*, 828 F.3d at 383 (quoting *Frazier*, 423 F.3d at 533). But the Sixth Circuit has also recently observed that, "[i]n the case of drug

7

dealers, evidence is likely to be found where the dealers live." *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020) (quotation marks and citation omitted).

Given the strain between these competing principles, the court in *Reed* "reconciled [its] caselaw in fact-specific ways." *Reed*, 993 F.3d at 448. It accomplished this by holding that "a court need not rely on a known drug dealer's status *alone* whenever other evidence (besides the dealer's living there) links drug dealing to the dealer's home." *Id*. (emphasis in original). Thus, the question this Court must answer is whether there is "other evidence" (besides Stafford's status as an alleged drug dealer, and the fact that he lived at White Pond) that links Stafford's alleged drug dealing to the residence. The Court finds that such evidence exists.

SA Fassler averred that Stafford and members of the Stafford DTO were frequently present and/or made stops at White Pond during the course and in relation to drug transitions. (Doc. No. 209-1 ¶ 18.) *See United States v. Berry*, 565 F.3d 332, 339 (6th Cir. 2009) ("[T]here is support for the proposition that status as a drug dealer plus observation of drug activity near defendant's home is sufficient to establish probable cause to search the home." (citing cases)).

For example, first the affidavit described two controlled purchases of drugs from Stafford and his associates at White Pond. (Doc. No. 209-1 ¶¶ 16–17.) On the first occasion, Stafford told the purchaser to meet him at White Pond. (*Id.* ¶ 16.) Although Stafford and the purchaser departed from the same location at the same time, the purchaser arrived before Stafford, suggesting that Stafford stopped somewhere to get the drugs. (*Id.*) On the second occasion, an associate of Stafford arrived at White Pond with the drugs for the purchaser, again suggesting that the drugs were stored elsewhere. (*Id.* ¶ 17.) But the fact that Stafford chose to conduct these purchases at White Pond supports the magistrate judge finding probable cause that some portion of the Stafford DTO's drug

trafficking activity and evidence thereof would be present at White Pond, such as the proceeds from these sales.

Second, SA Fassler's affidavit described that surveillance observed an occasion on which Stafford traveled from White Pond to a suspected Stafford DTO stash house (Hollinger) carrying what appeared to be a vacuum sealed bag. (*Id.* ¶¶ 25, 42.) The affidavit states that shortly after Stafford arrived at Hollinger with the vacuum sealed bag, two persons waiting to transport drugs to West Virginia for the Stafford DTO departed from Hollinger. (*See id.* ¶¶ 25, 42.) These persons were later pulled over by the Ohio Highway Patrol and a search of their car revealed a vacuum sealed bag full of narcotics. (*Id.* ¶ 26.)

Stafford contends that the affidavit does not support a probable cause finding that Stafford retrieved any drugs from White Pond because Stafford was at Hollinger earlier in the day and could have retrieved the drugs there and returned them later. (Doc. No. 190, at 3–4, 6.) However, Stafford's contention ignores the contemporaneous phone records that were included in the affidavit and before the magistrate judge. These phone records reveal that the two drug transporters were waiting for the drugs to be delivered to Hollinger. (Doc. No. 209-1 ¶¶ 40–42.) These persons were communicating with a Stafford DTO associate (Johnstone). (*Id.*) While waiting for the drugs to arrive at Hollinger, the persons asked Johnstone "U try to call this dude again?" (*Id.* ¶ 40.) Approximately thirty minutes later, Stafford calls Johnstone. (*Id.*) Right after that call, Johnstone texts the drug transporters saying, "He just called." (*Id.*) Over the course of several hours, Johnstone and the drug transporters exchange messages related to when the drugs would arrive at Hollinger so they could leave for West Virginia. (*Id.*) The last messages discussing when the drugs would arrive were sent at approximately 4:32 p.m. (*Id.* ¶ 41.) Surveillance recorded Stafford

9

leaving White Pond at 4:24 p.m. and arriving at Hollinger at approximately 4:31 p.m. with what appeared to be a vacuum sealed bag. (*Id.* ¶¶ 25, 42.) The drug transporters left for West Virginia at approximately 5:20 p.m. (*Id.* ¶ 42.) These facts before the magistrate judge support a probable cause finding that Stafford transported drugs kept at White Pond to Hollinger.

Third, SA Fassler's affidavit describes how Stafford likely sent members of the Stafford DTO to South Carolina to retrieve drugs to distribute in the greater-Akron area. (*Id.* ¶¶ 91–113.) After retrieving suspected drugs and driving back to Akron, the Stafford DTO associates stopped at White Pond. (*Id.* ¶ 109.) Surveillance observed Stafford at White Pond at the time the associates arrived. (*Id.* ¶ 108.) Surveillance observed the garage door at White Pond open and close before the associates departed approximately eight minutes after first arriving. (*Id.* ¶¶ 109–10.) Although surveillance did not observe any drugs or other contraband being moved into White Pond, common sense allows the magistrate judge to reasonably conclude that these Stafford DTO members stopped at White Pond after driving ten hours from South Carolina for some reason and, viewing the totality of the circumstances, that there is probable cause to believe they stopped to drop off drugs retrieved from South Carolina or other contraband associated with drug trafficking, such as records or cash that Stafford might keep at his residence.

Viewing the "totality of the circumstances," *Florida v. Harris*, 568 U.S. 237, 244, 133 S. Ct. 1050, 185 L. Ed. 2d 61 (2013), through the "lens of common sense," as the Supreme Court has instructed, *id.* at 248, these facts collectively are sufficient to overcome the "low bar of probable cause" to believe that a search of White Pond would uncover evidence of drug trafficking. *Moore*, 999 F.3d at 996.

### B. *Leon* Good Faith Exception

Even if the affidavit failed to provide probable cause for the warrant (which the Court concludes that it did), the good faith exception announced in *Leon* would still apply. Once again, the Court turns to the Sixth Circuit's recent decision in *Reed* for direction. In *Reed*, the court did not ever reach the question of whether there was a sufficient nexus between the alleged drug activity and the residence to support probable cause. Instead, the government argued, and the Sixth Circuit found, that the district court's exclusion of the evidence was improper under *Leon*'s exception, providing four reasons for its conclusion.

As an initial matter, the court found that the affidavit at issue established "two critical points." *Reed*, 993 F.3d at 451. The first point was that the "police had probable cause to believe that Reed was a drug dealer who had engaged in recent drug sales." *Id*. The second point was that "[t]he police had probable cause to believe that Reed lived at the home [that was searched]." *Id*. The court explained that even if these two points did not satisfy the nexus requirement for probable cause, they went "a long way toward showing that *Leon*'s good-faith exception applies." *Id*.

Next, the court determined that the affiant officer "could reasonably conclude that Reed's ongoing drug dealing sufficed to trigger [the Sixth Circuit's] 'well established' principle 'that if there is probable cause to suspect an individual of being an ongoing drug trafficker, there is a sufficient nexus between the evidence sought and that individual's home.'" *Id*. (quoting *United States v. Feagan*, 472 F. App'x 382, 392 (6th Cir. 2012)). The court observed that Sixth Circuit "precedent leaves unclear the amount of drug activity required to invoke this nexus principle[,]" noting that sometimes case law has suggested that there must be a large-scale operation, other times requiring recent, reliable evidence of drug activity. *Id*. (citing cases). Based on this "unsettled

11

jurisprudence," the court in *Reed* found that the affiant officer did not "behave recklessly by relying on the state judge's conclusion that Reed's drug activity sufficed." *Id*. at 452 (collecting cases).

Third, the court observed that the officer affiant "did not rely on Reed's drug activity alone. His affidavit described his experience investigating drug crimes, noting that '[the officer] has participated in numerous drug arrests, drug seizures, and drug investigations during his career as a police officer.'" *Id*. The court noted that, "[i]n many cases, courts have highlighted an affiant officer's experience that drug dealers keep evidence of dealing at their residence' as an additional reason to find probable cause to search the drug dealer's home." *Id*. (quotation marks and citations omitted).

As a fourth and final reason, the court in *Reed* underscored that "when assessing the reasonableness [of an affiant officer's] conduct, [the court] cannot lose sight of 'the fact-intensive nature of the probable cause inquiry in known drug dealer cases[.]" *Id*. (quoting *Brown*, 828 F.3d at 384.) "Because probable cause entails a deep dive into the totality of the circumstances, 'officers will often find it difficult to know how the general standard . . . applies in the precise situation encountered.'" *Id*. (quoting *District of Columbia v. Wesby*, -- U.S. --, 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018)). Noting that the "factual gradations" in these types of cases present challenges to trained jurists, the court asked "how can [the court] expect nonlawyer officers to know better than judges" how to navigate these "frothy nexus waters[.]" *Id*. (quotation marks and citations omitted).

The same four reasons would support an application of *Leon*'s good faith exception in the present case had the warrant not also established probable cause. First, as outlined above, SA Fassler's affidavit provided substantial evidence as to the "two critical points"; namely, that law

12

enforcement had probable cause to believe that Stafford was involved in recent drug trafficking activity and that he resided at White Pond. Second, SA Fassler would have had reason to believe that this knowledge would invoke the well-established principle that evidence of criminal wrongdoing is likely to be found in an individual's home.

Third, SA Fassler was also entitled to rely on his experience involving drug trafficking, as set forth in the affidavit, to conclude that Stafford was conducting business associated with drug trafficking from his home and that that drug dealers are likely to keep evidence of their trafficking in their home, which would only serve to reinforce the officer's good faith belief that evidence of drug trafficking would be found in White Pond. For example, SA Fassler's affidavit described his knowledge of the habits of drug dealers, including his knowledge that "large-scale narcotic traffickers usually maintain on hand (including in their homes) large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;" that "narcotic traffickers often maintain books, records," and other documentation "to assist in the distribution of controlled substances" and to "maintain records of debts owed and paid[.]" (Doc No. 209-1 ¶ 2(e)–(g).) SA Fassler further averred his knowledge that "it is common for large-scale drug traffickers to maintain firearms on their person[ ] and in their homes . . . to protect their drug supply and/or proceeds of their drug sales[.]" (*Id.* ¶ 2(j).) Relevant here then, investigators made two controlled purchases from White Pond and Stafford DTO associates frequented White Pond, including after returning from South Carolina with suspected drugs. Further, investigators had probable cause to believe that a Stafford DTO associate (Jackson) purchased a firearm for Stafford. (*Id.* ¶ 82.)

Fourth, in light of the foregoing, and given the factually intensive nature of the inquiry, the Court finds that SA Fassler's actions in relying on the warrant "fall within the range of

13

reasonableness permitted by *Leon*." *Reed*, 993 F.3d at 452 (citing, among authority, *Wesby*, 138 S. Ct. at 590.) Thus, even setting aside the Court's conclusion that probable cause supported the warrant here, the reasoning in *Reed* leads to the inevitable conclusion that the search was constitutionally permissible under *Leon*'s good faith exception.

## III. CONCLUSION

For the foregoing reasons, Stafford's motion to suppress is DENIED.

**IT IS SO ORDERED**.

Dated: November 18, 2022

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**